# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

MARCEL HOLLOMAN,

      Petitioner,

v.                          Case No. 8:19-cv-2953-CEH-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Marcel Holloman, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Having considered the petition, the response (Doc. 11), and the reply (Doc. 17), the petition will be denied.

## BACKGROUND

A state court jury convicted Holloman of one count of first-degree murder, two counts of armed robbery, and one count of attempted armed robbery. (Doc. 12-1, Ex. 9.) The state trial court sentenced him to life in prison. (*Id.*, Ex. 12.) The state appellate court *per curiam* affirmed Holloman's convictions and sentences. (*Id.*, Ex. 17.) Holloman's amended motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 was denied after the state court held an evidentiary hearing on some grounds. (*Id.*, Exs. 29, 30; Doc. 12-3, Ex. 34; Doc. 12-4, Ex. 52.) The state appellate court *per curiam* affirmed the denial of relief. (Doc. 12-4, Ex. 40.)

1

## FACTS[1]

On the morning of May 1, 2008, Jesus Rivera contacted Eddie Blue to buy marijuana. They arranged to meet at an apartment complex in Plant City, Florida. The marijuana was intended for Rivera's co-worker, Nicholas Ibarra. Rivera, Ibarra, and another co-worker, Jonathan Pickles, traveled to the apartment complex on their lunch break. Rivera drove his car, Ibarra sat in the front passenger's seat, and Pickles sat in the rear passenger's side seat. Rivera parked and made a phone call.

Blue, carrying a black nylon bag, walked up to the car, opened the rear driver's side door, sat down inside, and closed the door. He pulled out a gun and waved it around as he demanded money. Blue exited the car and stood by the front driver's side door where Rivera was still sitting. Blue again demanded money and pointed the gun at Rivera. Ibarra took $13 from his wallet and threw it at Blue in the hope Blue would take it and leave. Blue took the money but continued his demands.

Meanwhile, Holloman approached the passenger's side of the car from behind. Holloman was also armed with a gun. Holloman opened the rear passenger's side door. Holloman got in, sat down on top of Pickles, and demanded money. Holloman patted down Pickles and took his wallet. Holloman reached into the front seat and put the gun against Ibarra's back. Ibarra heard the gun click twice. Believing the guns were unloaded, Ibarra began talking to Rivera in Spanish and they agreed that the robbers

---

[1] The factual background is based on the trial transcript.

were "bluffing." (Doc. 12-4, Ex. 47, pp. 204-05.) Rivera stated that they should try to leave.

Blue and Rivera exchanged punches and went back and forth opening and closing the driver's side door. Blue took a few steps back and said, "If you don't give me the money, I'm going to put a hot one in you." (*Id.*, p. 207.) Blue shot Rivera. Blue and Holloman fled. Rivera drove the car a short distance before losing consciousness and crashing the car. He died from the gunshot wound.

Samuel Godbolt was a maintenance worker who was taking his lunch break at the apartment complex when he heard a gunshot. Godbolt saw two men running along a fence. He believed one man was about his height of 5 feet, 11 inches, and the other was about 6 feet, 3 inches. Joseph Webb was at the complex to look at an apartment. He was outside when he heard a gunshot. He saw two men running behind an SUV and then cut towards him at an angle. When one of the men was near the SUV, the man turned so Webb could see his face. Webb noticed that one man was taller than the other. Webb considered throwing a cup he was drinking from at the suspects to see if he could hit them, but decided not to when he noticed one had a gun.

Webb was shown a photopack and identified Holloman as the taller man. Webb was 100% certain of his identification. Pickles also chose Holloman out of a photopack but stated that he was only 30% sure of his identification because he never had a full view of the front of the second robber's face.

Holloman called his cousin, Jessica Porter, around lunchtime asking to be picked up. She and her grandmother picked up Holloman from Tyree Cooper's house.

3

After police responded to the crashed vehicle, a K-9 tracked a short distance to the back of the house where Blue lived. In a crawlspace below the house, police found a .380 silver gun that smelled of gunpowder, indicating it had been fired recently.

Blue pleaded guilty. As part of the plea agreement, he was to receive a prison sentence of 35 years in exchange for testifying truthfully at Holloman's trial. Blue testified that he and Holloman met up at a park near the apartments shortly before Blue was supposed to meet Rivera. Blue stated that he and Holloman planned and carried out the robbery together.

Holloman testified that he was at the apartment where Demondra Guion, the mother of his child, lived in the complex. Holloman stated that Guion and her aunt were there. He testified that Blue came by the apartment and that he gave Blue the marijuana in the black bag, but that Blue left on his own to go sell the marijuana. Holloman stated that he left Guion's apartment later and went to Tyree Cooper's house, where Guion came over to see him and where his cousin and grandmother picked him up. Guion also testified that Blue came to her apartment and took the bag from Holloman, but that Holloman did not leave with Blue. Guion stated that Holloman left after receiving a phone call and that she saw him later at Cooper's house.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on

the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the denial of postconviction relief without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

**EXHAUSTION OF STATE REMEDIES; PROCEDURAL DEFAULT**

A federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in his petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause

6

and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).

A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## INEFFECTIVE ASSISTANCE OF COUNSEL

Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Holloman must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant

setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Holloman must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## DISCUSSION

**Procedurally Defaulted Grounds**

### Grounds Two And Three

In Ground Two, Holloman argues that trial counsel was ineffective for failing to object when the State introduced hearsay through Detective Cross's testimony that a person who lived at the apartment complex said Holloman was at the crime scene.

In Ground Three, Holloman argues that trial counsel was ineffective for failing to request an independent act jury instruction.

Holloman did not raise these grounds in his brief when he appealed the denial of his postconviction motion. (Doc. 12-4, Ex. 37.) When at least one postconviction claim is resolved after an evidentiary hearing, an appellant must brief all claims he wishes the appellate court to review, including those claims denied without a hearing. *See Cunningham v. State*, 131 So.3d 793, 794 (Fla. 2d DCA 2012) (discussing the application of Florida Rule of Appellate Procedure 9.141(b)(3)). Therefore, because Holloman did not exhaust these claims on collateral appeal, they are now procedurally defaulted. *See id*; *see also Coolen v. State*, 696 So.2d 738, 742 n.2 (Fla. 1997) ("Coolen's failure to fully brief and argue [his] points constitutes a waiver of these claims.").

Holloman cannot return to state court to present the defaulted claims in an untimely and successive collateral appeal. *See* Fla. R. Crim. P. 3.850(k) (stating that an appeal from a final order denying postconviction relief may be taken within 30 days of the order's rendition). Holloman has not established that an exception applies to excuse the procedural default. *See Smith*, 256 F.3d at 1138. Therefore, Grounds Two and Three are barred from federal habeas review.

**Merits Review**

### Ground One (A)

Holloman argues that trial counsel was ineffective for failing to impeach State witness Joseph Webb with inconsistent statements Webb made at deposition and to police. Holloman contends that Webb could not initially identify him and that "[i]n

essence, Webb's identification of petitioner only improved over the span of 29 months from not being able to identify anyone to implicating petitioner with 100% certainty during trial." (Doc. 1, p. 4.)

Holloman states that Webb initially told police that the fleeing suspects did not look right at him, but that when they cut a corner he could see three-quarters of their faces. Holloman states that at his deposition, Webb told police that when Holloman came around the SUV, "I saw most of his face . . . and then as he began around the building it's almost like he looked right at me." (Doc. 12-1, Ex. 29, p. 5.) At trial, Webb stated that the two men ran behind an SUV and then cut towards him at an angle, running "diagonally across my path." (Doc. 12-4, Ex. 47, p. 254.) Webb testified that when one of the men got near the SUV, he turned his body such that Webb could see his face. (*Id.*, pp. 255-56.) Webb identified this person from a photopack as Holloman.

The state court granted Holloman an evidentiary hearing on this claim. Trial counsel testified that the alleged inconsistencies in Webb's statements "were fairly insignificant in light of the other testimony in the case." (Doc. 12-4, Ex. 52, p. 19.) Counsel stated that because Webb had seen the second robber's face and picked out Holloman, he did not think Webb's exact vantage point was important. (*Id.*, pp. 22-23.) Counsel believed that Webb's identification from the photopack was powerful evidence. (*Id.*, p. 18.) Counsel testified that maintaining credibility and trust with the jury was important, and that he did not think this matter was "sufficient to . . . get into." (*Id.*, pp. 19-20.)

10

Holloman testified to his belief that Webb claimed to have had a better view of the suspect with each statement he gave. (*Id.*, pp. 12-13.) But Holloman agreed that Webb was describing an ongoing event involving people who were running past him. (*Id.*, pp. 15-17.) Holloman further acknowledged that Webb's description involved seeing the people both "straight on" and at an angle. (*Id.*, p. 16.) Holloman also agreed that Webb said he was close enough that he thought about throwing his drink cup at the suspects. (*Id.*)

The state court denied the claim after the hearing:

> After reviewing the allegations, the court file, and the record, the Court finds Defendant has failed to establish that counsel's conduct was deficient. . . . Here, Defendant has failed to overcome his burden [under *Strickland*].

> Based upon the testimony presented at the April 27, 2017, evidentiary hearing, the Court finds that Defendant's testimony to be [sic] somewhat credible. The Court finds that on cross-examination, Defendant conceded that in each of Mr. Webb's individual statements, he was describing two people running from the scene of the shooting, and he was describing his ability to see the suspects at different times during this ongoing sequence of events. The Court has reviewed the police statement, deposition testimony, and trial testimony that were introduced into evidence at the hearing and agrees that the individual statements refer to Mr. Webb's ability to see and describe the suspects at various points during an ongoing sequence of events immediately following the shooting. As such, the Court finds that Mr. Webb's statement to the police and his deposition testimony are not inconsistent with his trial testimony.

> The Court further finds [counsel's] testimony to be highly credible, including his testimony that he believed that the areas of alleged impeachment Defendant suggested were fairly insignificant in light of the other testimony in the case, particularly where Mr. Webb identified Defendant in a photopack with absolute certainty shortly after the shooting. The Court also finds [counsel's] testimony credible that the

grounds suggested by Defendant were not sufficient where maintaining credibility with the jury was very important in this case.

Ultimately, the Court finds the testimony of [counsel] to be highly credible with regard to this claim, and further finds that Defendant himself conceded that Mr. Webb's statements were not inconsistent. Accordingly, the Court finds that [counsel] did not act deficiently by failing to impeach Joseph Webb's identification of Defendant at the scene where Mr. Webb's trial testimony was not inconsistent with his prior statements. . . . Finally, the Court finds that as a matter of trial strategy, [counsel] could reasonably conclude that an attempt to impeach Mr. Webb on the grounds alleged by Defendant could hurt the defense's credibility in front of the jury. As such, the Court concludes that the decision to not impeach Mr. Webb on these grounds was sound trial strategy, particularly in light of the fact that the statements were not inconsistent. As Defendant fails to demonstrate how counsel performed deficiently pursuant to *Strickland* . . ., no relief is warranted upon Claim 1(a).

(Doc. 12-3, Ex. 34, pp. 9-10.)

Holloman does not show that the state court unreasonably denied his claim. The court did not unreasonably conclude that Webb's statements "refer to Mr. Webb's ability to see and describe the suspects at various points during an ongoing sequence of events" and therefore were not inconsistent. As Holloman conceded at the hearing, the suspects were in motion and Mr. Webb saw them at different angles while they ran. Moreover, regardless of how Webb described his views of the suspects, Webb identified Holloman in a photopack shortly after the offenses as the taller man he saw and was certain about this identification.

The state court found that not attempting to impeach Webb on the proposed basis was sound trial strategy because it could have hurt the defense's credibility. The finding that counsel's choice was strategic is a finding of fact that is presumed correct.

*See Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." (quoting *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998))); *DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1273 (11th Cir. 2014) (stating that a question "regarding whether an attorney's decision is 'strategic' or 'tactical' is a question of fact"). Holloman does not rebut the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Therefore, to show entitlement to relief, Holloman must demonstrate that counsel's strategic decision was patently unreasonable. *See Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (stating that counsel's strategic decision "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it" even when the decision "appears to have been unwise in retrospect.") (citation omitted); *see also Franks*, 975 F.3d at 1176 ("Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices. . . . For Franks to prevail, then, he would have to show that *no* reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct.")

In light of Webb's identification of Holloman from the photopack and the circumstances under which Webb observed the suspects, Holloman does not show that counsel made a patently unreasonable strategic choice not to impeach Webb with his

earlier statements. Holloman does not show that the state court unreasonably applied *Strickland* in denying his claim. Nor does he show that the state court's decision was based on an unreasonable finding of fact. Holloman is not entitled to relief on Ground One (A).

**Ground One (B)**

Holloman alleges that Webb testified during his deposition that he used psychotropic medications and underwent treatment for issues like hallucinations and "alternate realties." (Doc. 1, p. 4.) The state trial court granted the State's motion *in limine* to exclude impeachment on these bases. (Doc. 12-1, Ex. 30, p. 6.) Holloman argued in his postconviction motion that trial counsel was ineffective in not adequately cross-examining Webb. He alleged that counsel allowed Webb to testify "without th[e] jury knowing how unreliable Webb's trial testimony could be." (Doc. 12-1, Ex. 29, p. 10.)

The state court interpreted this argument as alleging that counsel should have sought a rehearing of the state trial court's ruling to impeach Webb regarding the medication and its potential side effects. The state court denied this claim:

> In claim 1(c), Defendant alleges ineffective assistance of counsel due to counsel's failure to move the Court to partially reverse its ruling on the State's motion in limine to order to allow Joseph Webb's medication and side effects to be raised for impeachment purposes. Defendant alleges Mr. Webb was using Klonopin, an anti-anxiety medication, at the time of the offense he witnessed. Defendant alleges that Klonopin "may impair mental alertness and cause hallucinations, psychosis, visual field defects, [and] visual disturbance [sic] to name a few." Defendant asserts that trial counsel should've moved the Court to partially recede from its original ruling to allow Klonopin and its side effects to be raised for impeachment purposes. Defendant argues had trial counsel done so, "a substantial

medical based rebuttal to Webb's capacity to identify Hollman would have been heard by the jury raising a reasonable doubt."

After reviewing the allegations, the court file, and the record, the Court finds that Defendant presented a facially sufficient claim. The Court further finds that defense counsel did not act deficiently because requesting the Court to reverse its own ruling would have been meritless. As such, defense counsel "cannot be found ineffective for failing to pursue a course of action that counsel would—or should—have known was futile." *Claps v. State*, 971 So.2d 131, 134 (Fla. 2d DCA 2007); *see Maxwell v. Wainwright*, 490 So.2d 927, 932 (Fla. 1986) (finding that "we cannot find ineffectiveness based on lack of objection or argument when counsel could reasonably have decided that such objection or argument would have been futile in view of the established rules of law"). The Court finds that even if counsel had asked the Court to partially reverse its ruling, it would have been denied as the Court had already ruled granting the State's motion in limine. Additionally, the Court finds that the issue was preserved for appellate review to the extent counsel was able to do so. As such, no relief is warranted on claim 1(c).

(Doc. 12-1, Ex. 30, pp. 6-7.)

Holloman does not show entitlement to relief. Whether a motion to reconsider the state trial court's ruling on the motion *in limine* would have succeeded depends upon the operation of Florida evidentiary law. The state court found that such a motion would have lacked merit. This Court must defer to the state court's determination of state law. *See Pinkney v. Secretary, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's construction of its own law' when the validity of the claim that . . . counsel failed to raise turns on state law." (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))). Because the proposed motion

would have been denied under state law, Holloman does not show that trial counsel was ineffective for not presenting the motion.

Holloman also argued within his postconviction motion that counsel should have moved to exclude Webb as a witness because of his mental health. The state court did not expressly rule on this portion of Holloman's claim. This Court presumes that the state court nevertheless denied the claim on the merits.[2]

Holloman does not show that the state court's ruling was unreasonable. In Florida, a witness is presumed competent to testify. § 90.601, Fla. Stat. "[A] witness is incompetent to testify if the witness is unable to communicate to the jury, unable to understand the duty to tell the truth, or is unable to perceive and remember events." *Hayward v. State*, 183 So.3d 286, 317 (Fla. 2015) (citing *Rutherford v. Moore*, 774 So.2d 637, 646 (Fla. 2000)); *see also* § 90.603, Fla. Stat. A trial court has "broad discretion" in ruling on a motion to disqualify a witness. *Hayward*, 183 So.3d at 217.

Holloman does not show that Webb fell under any category that warrants disqualification of a witness. Webb communicated clearly to the jury and there is no indication that he did not understand his oath. Moreover, Holloman does not show

---

[2] When a state court addresses some claims raised by a defendant, but not a claim that is later raised in a federal habeas proceeding, the federal habeas court presumes that the state court denied the claim on the merits. *Johnson v. Williams*, 568 U.S. 289 (2013). However, *de novo* review of such a claim is appropriate when "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court[.]" *Id*. at 303. Even if the state court overlooked this part of Holloman's claim, he fails to show entitlement to federal habeas relief under *de novo* review for the same reasons addressed in this order.

that Webb was unable to perceive or remember events. Webb was able to describe what he observed and he identified Holloman with certainty. Holloman's argument is based on speculation about Webb's mental health conditions and the potential side effects of his medication. Speculative assertions cannot establish ineffective assistance of counsel. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim).

Therefore, Holloman fails to show a reasonable probability that a motion to disqualify Webb as a witness would have been granted and the outcome of the trial would have been different. Holloman does not show that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief on Ground One (B).

### Ground Four

Holloman contends that trial counsel was ineffective for failing to impeach Eddie Blue, who testified against him as part of a plea agreement. Holloman asserts that trial counsel should have called Samantha Green and Demondra Guion to "discredit Blue's plea driven testimony." (Doc. 1, p. 8.) Holloman claims that Green and Guion could have testified that Eddie Blue picked up a package from Guion's apartment before the robbery, but that Holloman did not leave the apartment with Blue. Guion was the mother of Holloman's children. Holloman stated in his postconviction motion that Samantha Green was Guion's aunt and that she was present at the apartment.

17

The state court denied Holloman's claim:

In claim 4, Defendant alleges ineffective assistance of counsel for counsel's failure to adequately cross-examine and impeach the testimony of Eddie Blue. Specifically, Defendant alleges trial counsel could've impeached Mr. Blue's statement that Defendant met him at a park before the robbery with testimony from Demondra Guion and Samantha Green that Mr. Blue met Defendant at their home shortly before the offense and that Mr. Blue left with a package. Defendant alleges this would've discredited Mr. Blue's testimony and would negate Mr. Blue's statement that he was not in the position to sell the marijuana. Lastly, Defendant alleges he stayed behind while Mr. Blue went to sell the marijuana.

. . .

Upon review, the Court finds that trial counsel did call Demondra Guion as a defense witness and questioned her as to Mr. Blue's statement that he met Defendant at the park. Trial counsel pursued the following line of questioning:

| | |
|---|---|
| [COUNSEL]: | All right. Do you know Eddie Blue? |
| MS. GUION: | Yeah. |
| [COUNSEL]: | All right. Do you recall whether you saw him that day? |
| MS. GUION: | Yeah. |
| [COUNSEL]: | And where did you see him? |
| MS. GUION: | At my backdoor. |
| [COUNSEL]: | At your backdoor of your apartment? |
| MS. GUION: | At my mother's apartment, yeah. |
| [COUNSEL]: | And about what time was that? Do you know? |
| MS. GUION: | No. |

18

| [COUNSEL]: | What was he doing there? Do you know? |
|---|---|
| MS. GUION: | He was getting a bag from Marcel. |
| [COUNSEL]: | So Eddie Blue came to your mother's apartment where you were living and picked up a bag from Marcel? |
| MS. GUION: | Yeah. |

Consequently, the Court finds that trial counsel did in fact impeach Eddie Blue's testimony with the testimony of Demondra Guion that Mr. Blue met Defendant at her mother's apartment where he picked up a bag from Defendant. Consequently, the Court finds Defendant cannot prove deficient conduct or prejudice.

(Doc. 12-1, Ex. 30, pp. 10-11) (state court's record citation omitted).

Holloman does not show that the state court unreasonably denied his claim. As the state court's order addressed, counsel did call Guion. Guion testified that Holloman was at her apartment, that Blue came by and picked up a bag, and that Holloman did not leave with Blue. Guion's statements therefore contradicted Blue's testimony that Blue and Holloman met up at a park before the robbery.

Further, to the extent that Holloman claims that Green would have testified to the same information to which Guion testified, Green's testimony would have been cumulative. Trial counsel was not ineffective for declining to present cumulative evidence. *See Ledford v. Warden, Ga. Diag. and Classification Prison*, 818 F.3d 600, 649-50 (11th Cir. 2016) (stating that "no prejudice can result from the exclusion of cumulative evidence"). Holloman does not show that the state court's decision

involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief on Ground Four.

**Ground Five**

Holloman argues that trial counsel was ineffective for not calling Maurice Ruth as an alibi witness. He asserts that Ruth would have testified Holloman left Demondra Guion's house to meet Ruth at Tyree Cooper's house. Holloman also states that Ruth would have testified he heard Holloman talking on the phone with Blue and asking whether the marijuana sale was successful, and that when Blue arrived at the house, he stated that "things did not go the way they were supposed to." (Doc. 1, p. 9.) Holloman contends that Ruth could have testified that Blue handed a large package to Holloman and that Blue was anxious and asked for marijuana "to help settle his nerves." (*Id.*)

The state court denied Holloman's claim:

In Claim 5, Defendant alleges ineffective assistance of counsel due to counsel's failure to call an alibi witness, Maurice Ruth. Specifically, Defendant alleges that Maurice Ruth, an available witness, would have explained that Defendant arrived at Tyree Cooper's home to meet Ruth after leaving the home of Demondra Guion. Ruth would then explain that []he overhea[r]d Defendant speaking to Eddie Blue on the phone when Defendant asked "if business had completed (meaning the marijuana had been sold)" because Defendant was looking for his money. Ruth would further explain that Eddie Blue arrived at Ruth's residence and said "things didn't go the way it was supposed to" and then saw Eddie Blue hand over a large package to Defendant. Lastly, Defendant alleges that if the alibi witness was called to testify, it would prove Defendant was not the "tall perpetrator that accompanied [B]lue in committing an armed robbery" and the outcome of the case would have been favorable to the defense.

In its December 22, 2015, Order, the Court found Claim 5 facially sufficient. As such, the Court ordered the Office of the State Attorney to respond to Claim 5. In its response, the State asserts that when viewed in light of the other testimony in the case, including the trial testimony of defense witness Ms. Guion, this testimony, if true, would not have established an alibi. The State asserts that instead, this testimony would have only corroborated the testimony of several witnesses, including Ms. Guion, that the defendant fled the robbery/murder scene and was hiding out at Tyree Cooper's house after the murder. Specifically, the State asserts that the proposed testimony of the "alibi" witness would have corroborated Ms. Guion's testimony that Defendant left her residence just before the shooting occurred, and she found Defendant at [Cooper's] house 10-15 minutes after the murder. The State further asserts that to present and argue this evidence as an alibi would have required counsel to make an argument that was inconsistent with and contradicted the testimony of Ms. Guion, who was his own witness. The State further asserts that the suggested testimony of the "alibi" witness as it concerns several statements made by Defendant would be self-serving hearsay made by Defendant as, as such, would not have been admissible.

The Court finds the State's Response compelling. The Court finds that Ruth's testimony as to the statements allegedly made by Defendant and Eddie Blue would have been inadmissible at trial. *See Lott v. State*, 695 So.2d 1239, 1242-43 (Fla. 1997) ("Self-serving statements are not admissible under section 90.803 [. . .]"; *Cotton v. State*, 763 So.2d 437, 439 (Fla. 4th DCA 2000) ("When a defendant seeks to introduce his own out-of-court exculpatory statement for the truth of the matter stated, it is inadmissible hearsay"); *Logan v. State*, 511 So.2d 442, 443 (Fla. 5th DCA 1987) (finding that "self-serving statements, made under circumstances showing their lack of trustworthiness, are clearly hearsay and are not admissible under any of the hearsay exceptions"); *Fagan v. State*, 425 So.2d 214, 214 (Fla. 4th DCA 1983) (finding that the admission of self-serving statements, with no corroboration or other indicia of truthfulness, would be contrary to the rules of evidence). Consequently, the Court finds that Defendant cannot prove that he was prejudiced by counsel's failure to call Ruth because he cannot prove that the outcome of the trial would have been any different. Although Ruth could have testified as to Defendant's presence at Tyree Cooper's house, that testimony would have been cumulative since other witnesses, including Ms. Guion and Defendant, testified as to Defendant's presence at the Coronet Street house. *See Williamson v. Dugger*, 651 So.2d 84, 88 (Fla. 1994) (affirming summary denial of a post-conviction motion where alleged newly-

discovered evidence would have been cumulative). Accordingly, no relief
is warranted upon Claim 5.

(Doc. 12-3, Ex. 33, pp. 6-7.)

The state court's decision was reasonable. Initially, the state court found that
under Florida evidentiary law, prospective witness Maurice Ruth could not have
testified to what he allegedly heard Holloman and Blue say. This Court must defer to
that state law determination in considering Holloman's ineffective assistance claim.
*See Pinkney*, 876 F.3d at 1295.

Further, as the state court found, testimony from Maurice Ruth that Holloman
was at Cooper's house would have been cumulative to testimony of other witnesses.
Jessica Porter, Holloman's cousin, testified that she and her grandmother picked up
Holloman from Cooper's house around lunchtime. (Doc. 12-4, Ex. 48, pp. 387, 391-
92.) Demondra Guion testified that Holloman left her apartment at some point after
Eddie Blue left with the black bag, and that she later saw Holloman at Cooper's house.
(Doc. 12-4, Ex. 50, pp. 690-92.) And Holloman testified that he left Guion's apartment
for Cooper's house sometime after 11:50 a.m. (*Id.*, pp. 707-09.)

As addressed, counsel is not ineffective for failing to present cumulative
evidence. *See Ledford*, 818 F.3d at 649-50. In addition, Holloman's claim is speculative
because he does not present any evidence establishing what Maurice Ruth would have
testified to had he been called. *See Shaw v. United States*, 729 F. App'x 757, 759 (11th
Cir. 2018) ("[The Eleventh Circuit has] stated that complaints about uncalled
witnesses are not favored, because the presentation of testimony involves trial strategy

and 'allegations of what a witness would have testified are largely speculative.' " (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978))); *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009) ("In a habeas petition alleging ineffective assistance of counsel, mere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." (citing *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001))).

The state court did not expressly address Holloman's allegation that Maurice Ruth would have testified that at Cooper's house, Blue smoked marijuana because he was anxious. This Court presumes that the state court ruled on this aspect of Holloman's ineffective assistance claim.[3] Considering the totality of the evidence, Holloman does not establish a reasonable probability of a different outcome at trial had Ruth testified that Blue was anxious a short time after the offenses and smoked marijuana. Since he does not show that he was prejudiced by the omission of such testimony, Holloman fails to establish ineffective assistance for not calling Ruth.

Holloman does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Five.

---

[3] Even assuming that the state court did not do so and that Holloman is therefore entitled to *de novo* review of this part of his claim, *see Johnson*, 568 U.S. at 303, he is not entitled to relief for the same reasons addressed in the order.

**Ground Six**

Holloman argues that counsel was ineffective for not introducing evidence that Joseph Gimblet committed the crime. Holloman asserts that he and Gimblet have "identical features" and that trial counsel had "sufficient evidence" to show that Gimblet and Eddie Blue were responsible. (Doc. 1, p. 10.)

The state court held an evidentiary hearing on this claim. Counsel testified that he was aware of Gimblet, but that Gimblet was nearly one foot shorter than Holloman. Department of Corrections documentation showed that Gimblet is 5 feet, 6 inches tall. (Doc. 12-4, Ex. 52, p. 26.) Holloman stated at the evidentiary hearing that he is 6 feet, 4 inches tall. (*Id.*, p. 25.) The shooter, Eddie Blue, testified at trial that he is 6 feet tall. (Doc. 12-4, Ex. 50, p. 650.) Counsel believed that blaming Gimblet could have damaged the defense in light of witness testimony that the second robber was taller than the shooter, and he decided not to present the theory that Gimblet was the second robber. (Doc. 12-4, Ex. 52, pp. 29-30.)

At the hearing, Holloman testified that Blue admitted to him that Gimblet was involved, that the victim called Gimblet the day of the offenses, and that Gimblet lived a short distance from the crime scene. (*Id.*, pp. 23-25.)

The state court denied Holloman's claim:

After reviewing the allegations, the court file, and the record, the Court finds Defendant has failed to establish that counsel's conduct was deficient. . . . Defendant has failed to overcome his burden [under *Strickland*].

Based upon the testimony presented at the April 27, 2017 evidentiary hearing, the Court finds the testimony presented by [counsel] to be highly

credible and more credible than that of Defendant. *See Smith*, 697 So.2d at 992 (stating that following an evidentiary hearing, the finder of fact can rely upon testimony it finds to be credible and reject testimony it finds to be untrue). The Court initially finds Defendant's testimony to be somewhat credible. Specifically, the Court finds that Defendant gave [counsel] some information identifying Mr. Gimblet as a potential suspect. However, the Court finds that Defendant is not entirely credible where he presented inconsistent testimony at the evidentiary hearing, most notably his testimony that he only learned of Mr. Gimblet's potential involvement months after the offense even though he swore in his motion that he found out about Mr. Gimblet's participation the night of the offense. Although Defendant tried to explain this inconsistency by claiming that a prison law clerk wrote his motion for him, the Court finds that this inconsistency and Defendant's attempt to explain it brings into serious doubt Defendant's credibility.

The Court further finds [counsel's] testimony to be highly credible, including his testimony that he did not believe it would be advantageous at trial to bring up Mr. Gimblet as an alternative suspect based upon his review of the Department of Corrections records that reflected Mr. Gimblet was around one foot shorter than Defendant, along with his review of eyewitness statements that consistently described the second robber as taller than Mr. Blue, who was six feet tall. The Court also finds highly credible [counsel's] testimony that if he had presented evidence related to Mr. Gimblet, the State could have used the issue of Mr. Gimblet's significant difference in height with Defendant in order to hurt the defense's credibility. The Court additionally finds highly credible [counsel's] testimony that he considered the option of introducing evidence related to Mr. Gimblet's alleged guilt, but ultimately made the strategic decision not to do so based on his forty-plus years of experience as a defense counsel in this county.

Ultimately, the Court finds the testimony of [counsel] to be highly credible and more credible than that of Defendant with regard to this claim. Accordingly, the Court finds that [counsel] did not act deficiently by failing to investigate and introduce admissible evidence of Joseph Gimblet's guilt for the instant offense where [counsel] reviewed Department of Corrections records reflecting that Mr. Gimblet was significantly shorter than both Defendant and Mr. Blue, and all eyewitness statements described the second robber as taller than Mr. Blue. The Court finds that as a matter of trial strategy, [counsel] could reasonably conclude that the presentation of evidence related to Mr. Gimblet could hurt the defense's credibility in light of the substantial

differences in height of the parties involved. As Defendant fails to demonstrate how counsel performed deficiently pursuant to *Strickland* . . ., no relief is warranted upon Claim 6.

(Doc. 12-3, Ex. 34, pp. 15-17.)

Holloman does not show that the state court's decision was unreasonable. The state court's finding that trial counsel's testimony was credible is a finding of fact that is presumed correct. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) (stating that "[t]he factual findings of the state court, including the credibility findings, are presumed to be correct"). A petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Holloman has not presented clear and convincing evidence to rebut the presumption that the state court's credibility finding was correct.

The testimony that the state court found credible shows that counsel considered presenting the theory that Gimblet committed the robbery with Eddie Blue, but decided that this theory would have lacked credibility given the disparity in height between Gimblet and Holloman. The state court found counsel's choice not to pursue this theory was a strategic decision. This is also a finding of fact that is presumed correct. *See Franks*, 975 F.3d at 1176; *DeBruce*, 758 F.3d at 1273. Holloman does not rebut the presumption of correctness by clear and convincing evidence. Nor does he demonstrate that counsel's strategic decision was patently unreasonable under the circumstances. *See Dingle*, 480 F.3d at 1099; *Franks*, 975 F.3d at 1176.

Evidence adduced at trial supports the conclusion that counsel made a reasonable decision. Again, Eddie Blue testified that he is 6 feet tall. (Doc. 12-4, Ex. 50, p. 650.) Nicholas Ibarra, who was in the front passenger seat of the car, observed that the second robber was taller than the shooter. (*Id.*, Ex. 47, pp. 197-98.) Samuel Godbolt, the maintenance worker who saw two men running by, observed that one was approximately 5 feet 11 inches tall, and the other was approximately 6 feet, 3 inches. (*Id.*, p. 240.) Joseph Webb testified that he is 5 feet, 8 inches tall, that one man he saw was a few inches taller than him, and that the second man was a few inches taller than the first. (258.) Webb identified the taller of the two as Holloman. Under these circumstances, Holloman does not show that counsel's strategic decision not to argue that Gimblet was the second robber was patently unreasonable.

Holloman does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Six.

It is therefore **ORDERED** that Holloman's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Holloman and to **CLOSE** this case.

It is further **ORDERED** that Holloman is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). The district court or the circuit court of appeals must issue a certificate of appealability. *Id.* To obtain a certificate of appealability, Holloman must show that reasonable jurists would

find debatable both (1) the merits of the underlying claims and (2) the procedural issues
he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484
(2000). Holloman has not made the requisite showing. Since Holloman is not entitled
to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on March 20, 2023.

Charlene Edwards Honeywell
United States District Judge